**SO ORDERED.**

**DONE and SIGNED June 1, 2021.**



_____
**JOHN S. HODGE**
**UNITED STATES BANKRUPTCY JUDGE**

---

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case Number: 20-30681 |
| | § | |
| Karcredit, L.L.C. | § | Chapter 7 |
|   Debtor | § | |
| _____ | § | |
| Cross Keys Bank | § | |
|   Plaintiff | § | Adversary Proceeding |
| | § | |
| vs. | § | Case No. 20AP-03011 |
| | § | |
| Ronnie D. Ward, et al | § | |
|   Defendants | § | |

### Memorandum Ruling

This case involves the double-pledging of collateral. In a double-pledge scheme, a borrower or guarantor pledges the same collateral to different lenders. For the scheme to work, the lenders must be unaware that the same collateral is being used to secure separate loans.

In this case, an insider of Debtor used corporate stock as collateral to secure

different guarantees to different lenders. In Louisiana, a pledge of stock can be perfected by possession of the original stock certificate. Here, the double-pledge occurred after the issuer of the stock issued a replacement stock certificate. The result was two original certificates representing the same shares of stock.

Debtor's insider pledged the original certificate to guarantee a loan to a non-debtor. After the replacement certificate was issued, the insider pledged it to a different lender to secure a separate loan made to Debtor. While Debtor shoulders the blame for instigating the double-pledge, the issuer of the stock is not blameless because it knew that both lenders held a security interest in the same stock.

The scheme was not detected until Debtor's lender called the loan. Debtor was unable to pay nearly $3.2 million to satisfy the debt. When Debtor's lender filed suit to enforce its security interest in the stock, it discovered that another lender claimed to hold the same collateral. Litigation ensued. The two lenders eventually agreed to a resolution: one bank would be recognized as the holder of a first ranking, valid and perfected security interest in the stock, while the other bank would seek a money judgment against the issuer of the stock.

The motion before the court seeks a money judgment against the issuer of the stock, a remedy expressly allowed by Louisiana law in cases of "overissued" corporate stock. La. R.S. § 10:8-210(d). No material facts are in dispute. The moving party is entitled to judgment as a matter of law.

For reasons that follow, summary judgment is proper.

## Background

The summary judgment evidence has not been disputed by any party. The court adopts by reference the Statement of Uncontested Facts filed as docket no. 195-7. The evidence is summarized below.

On July 17, 2020, Cross Keys Bank ("**CKB**") filed an involuntary petition under Chapter 7 of the Bankruptcy Code against Karcredit, LLC ("**Debtor**"). Thereafter, this court entered an order for relief against Debtor.

Prior to the commencement of the bankruptcy case, Debtor was in the business of financing the purchase of used cars, including cars sold by JD Byrider of Monroe. To finance its business operations, Debtor obtained a loan in the form of a revolving line of credit from CKB in 2012. The loan was guaranteed by Ronnie Ward ("**Ward**") and other insiders. CKB also made loans to Ward and other companies owned by him (the "**Ward Parties**"). In August 2019, Debtor owed CKB nearly $3.2 million and the Ward Parties owed nearly $2.8 million, for a total of approximately $6 million. By then, Debtor was in default and CKB called the loans.

Long before CKB made its initial loan to Debtor, Ward guaranteed a $683,825.00 loan made by Caldwell Bank & Trust Company ("**Caldwell Bank**") to another entity that he owned, Radioactive Images, LLC. In conjunction with that loan, on August 23, 2006, Ward pledged to Caldwell Bank 3,175 shares of stock in Homeland Bancshares, Inc. ("**Homeland**") represented by Certificate 253. On that date, Caldwell Bank perfected its security interest in the stock by taking physical possession of Certificate 253. Caldwell Bank has had continuous custody of that

certificate since then.

On September 27, 2010, Caldwell Bank loaned $424,670.66 to another entity owned by Ward, Ward Chevrolet-Olds, Inc. ("**Ward Chevy**"). In conjunction with that loan, Ward executed another pledge agreement which pledged the stock represented by Certificate 253 as collateral.

Later that year, the former Homeland Bancshares, Inc. merged with Homeland Interim Company, with the resulting entity also called Homeland Bancshares, Inc. The merger agreement required the cancellation of all former Homeland stock and the reissuance of stock in new Homeland to replace the cancelled stock in former Homeland. The merger agreement stated that only the "holder" of Certificate 253 could surrender the stock for replacement shares. Further, language on the face of Certificate 253 stated only the "holder" could surrender/transfer Certificate 253.

Since Ward had transferred custody of his stock to Caldwell Bank, he did not surrender the stock certificate to the new entity for reissuance. Instead, on November 21, 2011, Ward signed a lost stock affidavit falsely claiming he lost Certificate 253, and he asked Homeland to issue a replacement stock certificate. To be clear, Ward pledged Certificate 253 to Caldwell Bank on September 27, 2010, but on November 21, 2011, claimed that he had lost Certificate 253.

Without requiring Ward to post an indemnity bond, as permitted by La. R.S. § 10:8-405(a)(2), Homeland cancelled Certificate 253 and issued to Ward Certificate 495 for the same number of shares to replace Certificate 253. Caldwell Bank had no

knowledge that Certificate 253 had been cancelled and replaced by Certificate 495 until late May 2019.

Following the merger, Caldwell Bank made two more loans using Certificate 253 as collateral. In 2013 and 2018, Caldwell Bank loaned $409,931.53 and $388,720.80, respectively, to Ward Chevy. In connection with each loan, Ward signed a pledge agreement in which he pledged Certificate 253 to secure Caldwell Bank's loan to Ward Chevy. When Ward signed the pledge agreements, he failed to tell Caldwell Bank that he had previously stated under oath that Certificate 253 was lost, and that Homeland issued Certificate 495 to replace Certificate 253.

Since at least July 11, 2016, Homeland has had actual knowledge that Ward pledged his stock in Homeland to Caldwell Bank as security for a loan.

On April 15, 2019, Ronnie Darden ("**Darden**"), the President of Homeland, sent to Steve Richardson, the President of Caldwell Bank, an email providing the value of the stock so that Caldwell Bank could value the stock pledged by Ward as collateral for loans.

*The very next day*, on April 16, 2019, Darden emailed Sherry Harrell of CKB to provide her the value of the stock so that CKB could value the stock—which Homeland/Darden knew Ward proposed to pledge to CKB as collateral for a guaranty of a loan to Debtor. Darden knew that Ward planned to pledge his same stock to secure loans to Caldwell Bank and CKB, yet he neither did nor said anything to prevent or disclose the double-pledge.

On April 17, 2019, Ward signed a security agreement granting CKB a

security interest in his stock represented by Certificate 495 and delivered possession of Certificate 495 to CKB. Thus, by April 2019, Ward had pledged the same shares of stock to two different lenders to secure two different loans, without either lender knowing they were holding the same collateral.

As a result of the double-pledge, Caldwell Bank lost its first-priority security position in the stock, and CKB now has the superior ranking position.[1]

As of March 31, 2021, the stock had a value of $682,625.00 ($215/share). As of April 26, 2021, Caldwell Bank is owed $450,088.39 by Ward.[2] Thus, had it retained its first-priority rank, Caldwell Bank would have been fully secured. As a result of the loss of its ranking, however, Caldwell Bank now finds itself wholly unsecured.

This lawsuit was initially filed in state court by CKB against Debtor and its insider-guarantors to collect a promissory note and enforce commercial guaranties. Caldwell Bank intervened, asserting a superior security interest in the collateral

---

[1] In Louisiana, a secured party may perfect a security interest in investment property through filing a financing statement or through control of the investment property. La. R.S. §§ 10:9-312, 9-314. Here, Caldwell Bank perfected its security interest by taking possession of Certificate No. 253. It did not file a UCC-1 financing statement. Cross Keys, on the other hand, perfected its security interest in Certificate No. 495 by taking possession of it and by filing a UCC-1 financing statement. Conflicting security interests held by secured parties, each of which has control, rank according to priority in time of obtaining control. La. R.S. § 10:9-328. The lenders agree that CKB is a "protected" purchaser of Certificate No. 495 within the meaning of La. R.S. § 10:803(a). As such, CKB received heightened protections. La. R.S. § 10:803(b) provides that "a protected purchaser also acquires its interest in the security free of any adverse claim." Accordingly, CKB acquired its interest in the stock, free of Caldwell Bank's adverse claim. The court entered a consent judgment which resolved the ranking dispute and recognized CKB as the holder of a perfected, first ranking security interest in the stock and Caldwell Bank as the holder of the second ranking position. See docket no. 211.

[2] Ward and Ward Chevy stipulated to the entry of a consent judgment which made them liable, *in solido*, to Caldwell Bank for $442,348.15, plus interest. See docket no. 144.

securing Debtor's loan. After an involuntary bankruptcy petition was filed against Debtor, the suit was removed to federal district court and referred to this court for adjudication.

## Conclusions of Law and Analysis

For reasons that follow, Homeland is liable to Caldwell Bank for damages arising from the breach of the merger agreement and its breach of the provisions of Certificate No. 253. Homeland is also liable to Caldwell Bank for liabilities imposed on a stock issuer by virtue of La. R.S. §§ 10:8-405(b) and 10:8:210(d).

### A. <u>Jurisdiction</u>

As a threshold issue, the court must independently assess subject matter jurisdiction. *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) (citing *Arbaugh*, 546 U.S. at 514) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it.").

The jurisdiction of bankruptcy courts is grounded in and limited by statute. 28 U.S.C. § 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." The district courts may, in turn, refer "any or all proceedings arising under title 11 or arising in or related to a case under title 11 … to the bankruptcy judges for the district." 28 U.S.C. § 157(a).

Because this litigation did not arise under the Bankruptcy Code or in the bankruptcy case, the only potential basis for jurisdiction is that it is "related to" the bankruptcy case. The Fifth Circuit has summarized the test to determine "related

to" jurisdiction as follows:

> It is well established that "[f]ederal courts have 'related to' subject matter jurisdiction over litigation arising from a bankruptcy case if the 'proceeding could conceivably affect the estate being administered in bankruptcy.'" *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 386 (5th Cir. 2010) (quoting *In re TXNB Internal Case*, 483 F.3d 292, 298 (5th Cir. 2007)). " 'Related to' jurisdiction includes any litigation where the outcome could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankrupt estate." *Id.* (citation omitted).
>
> \*\*\*
>
> In analyzing jurisdiction over cases that are purportedly "related to" a bankruptcy case, we apply a broad "conceivable effect" test. *See Fire Eagle L.L.C. v. Bischoff* (*In re Spillman*), 710 F.3d 299, 304–05 (5th Cir. 2013).

*In re KSRP, Ltd.*, 809 F.3d 263, 266 (5th Cir. 2015).

Under the "conceivable effect" test, the court must determine whether the claims asserted in the complaint have any conceivable effect on the bankruptcy estate if they are successful. *Id.* at 267.

In this case, the lenders asserted claims to determine the validity of their security interests in collateral and to challenge the other party's priority ranking. They also asserted third-party claims against the issuer of the stock, Homeland, to the extent their ranking is subordinated. Although both lenders asserted third-party claims against Homeland, only one of them can succeed on those claims as only one suffered a loss of its superior ranking.

These claims easily satisfy the broad "conceivable effect" test because if either CKB or Caldwell Bank is successful in recovering money from a third party (such as

Homeland) or from the liquidation of its collateral, it could result in a dollar-for-dollar reduction of the amount of its claim against the estate. Any change in the amount of a proof of claim could conceivably affect the estate being administered in bankruptcy. *Randall & Blake, Inc. v. Evans (In re Canion),* 196 F.3d 579, 586 (5th Cir. 1999) (claims between two non-debtors that will potentially reduce the bankruptcy estate's liabilities affect the estate sufficient to confer "related to" jurisdiction); *In re Majestic Energy Corp.,* 835 F.2d 87, 90 (5th Cir. 1988) (an action is related to bankruptcy if "the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."); *Copelin v. Spirco, Inc.,* 182 F.3d 174, 179 (3rd Cir. 1999) ("[T]he key word is 'conceivable.' Certainty or even likelihood [of effect on the estate being administered in bankruptcy] is not a requirement." (Internal quotation marks and citation omitted; alteration in original)); *In re Titan Entergy,* 837 F.2d 325, 330 (8th Cir. 1998)("[E]ven a proceeding which portends a mere contingent to tangential effect on a debtor's estate meets the broad jurisdictional test [for 'related to' jurisdiction]."); *Holmes v. Deutsche Bank National Trust Co.* (*In re Holmes*), 387 B.R. 591 (Bankr. D. Minn. 2008) ("[creditor's] recovery from [third party] would have an indirect effect on the administration: any amount so received would reduce the amount of any unsecured claim that could be allowed in favor of [creditor]."); *In re Stillmunkes*, No. AP 19-09032, 2020 WL 2121267, at *2–3 (Bankr. N.D. Iowa Apr. 30, 2020) (dispute between a creditor and a third party could potentially impact the creditor's claim

against the estate by establishing an alternative source of payment for a part of its claim from the third-party defendant).

The third-party controversies here have a close nexus to this bankruptcy case. Success on the third-party claims will plainly benefit Debtor's estate and its creditors because it could lead to a reduction in liabilities owed by the estate.

Accordingly, this court concludes it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and by virtue of the reference by the district court pursuant to 28 U.S.C. § 157(a) and LR 83.4.1.

**B.** **Summary Judgment Standards**

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

All facts and inferences considered pursuant to a motion for summary judgment must be construed in the light most favorable to the non-movant party. *See Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). However, summary judgment cannot be defeated by conclusory allegations, unsupported assertions, or presentation of a mere scintilla of evidence. *See McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012).

**C.** **Caldwell Bank was damaged by Homeland's breach of the merger agreement and the provisions of Certificate No. 253.**

Caldwell Bank argues that it was damaged by Homeland's breach of the

merger agreement and the provisions of Certificate No. 253. Relying upon *Whitney Nat. Bank v. Howard Weil Financial Corp.*, 631 So. 2d 1308 (La. Ct. App. 4th Cir. 1994), it argues that Louisiana law provides a remedy to make it whole. *Whitney* held that a pledgee of stock was entitled to recover damages for the loss of its pledge when the issuer of the stock failed to abide by its own restrictions on the transfer or exchange of shares and transferred new certificates to the pledgor of the stock without surrender of the old certificates. The facts in *Whitney* are substantially similar to the facts of this case.

In *Whitney,* a borrower pledged shares of his stock to secure a loan from the bank. Subsequently, the issuer of the stock merged with another entity. The merger agreement provided for the cancellation of the stock in the existing entity and the issuance of stock in the new entity. A new certificate was issued to the borrower for stock in the new entity. However, the borrower's original certificates representing the shares pledged to the bank remained in the bank's possession and were never presented for cancellation. Subsequently, the bank tendered the certificates to the merged entity and requested that new certificates be issued in the borrower's name and returned to it. The new entity claimed that the borrower had already received a certificate for his shares and the stock retained by the bank had no value. The bank sought damages for the issuer's wrongful refusal to register the transfer and exchange of certificates to it. The court held that the issuer was liable. Both the certificate and the merger agreement required "surrender" before transfer.

This case is nearly identical to *Whitney*. On October 28, 2010, pursuant to a

merger agreement, Homeland merged with Homeland Interim Company, with the surviving company also being called Homeland Bancshares, Inc. The "exchange procedures" in the merger agreement provided that, "[u]pon surrender to the exchange agent of a Certificate for cancellation, … the holder of such Certificates shall be entitled to receive in exchange … certificates representing the New Common Stock with the additional legends as provided therefore by the Shareholder's Agreement, as applicable."

In *Whitney*, the court noted: "A contracting party may stipulate a benefit for a third person, not a party to the contract. La. C.C. Art. 1978. Such a stipulation, generally referred to as a *stipulation pour autrui,* gives the third party beneficiary the right to demand performance from the promisor. La. C.C. Art. 1981." *Whitney*, 631 So. 2d at 1310.

As in *Whitney*, the merger agreement in this case stipulated a benefit in favor of "holders" of Homeland stock. The holders of Homeland stock were third party beneficiaries of the merger agreement and thus had the right to enforce their rights under the agreement. Here, Caldwell Bank was the holder of Certificate 253 because it had physical possession of that certificate for more than four years before the merger agreement was executed on November 23, 2010. Only "holders" of Homeland stock were entitled to surrender their certificates and receive certificates for the identical number of shares in the new entity. In breach of its obligations to Caldwell Bank, a holder, under the merger agreement, Homeland issued Certificate 495 to Ward, a non-holder of Certificate 253, in exchange for Certificate 253. As

such, Homeland breached its duty to Caldwell Bank and thus is liable for the damages caused by its breach.

Likewise, Certificate 253 states that it was "transferable only on the books of the Corporation by the holder hereof in person or by attorney upon surrender of the Certificate properly endorsed." As noted in *Whitney*, according to the face of Certificate 253, only the "holder" could transfer it by surrender to Homeland. As in *Whitney*, Caldwell Bank, as the holder, had a right to rely on its physical possession of Certificate 253 as protection from any erroneous exchange or transfer of the shares of stock represented by it. *Whitney*, 631 So.2d at 1312.

Homeland breached the express provisions of Certificate 253 by issuing Certificate 495 as a replacement certificate for Certificate 253 to Ward without requiring either Ward or the holder (Caldwell Bank) to surrender Certificate 253.

With respect to Caldwell Bank's damages caused by the breach of the merger agreement and breach of Certificate 253, it is entitled to lesser of the amount secured by Certificate 253 or the value of the stock. As of March 2021, the value of Homeland stock was $215 per share. Thus, as of March 2021, the value of the 3,175 shares of Homeland stock owned by Ward and pledged to both Caldwell and CKB was $686,625.00 ($215/share x 3,175 shares).

As of April 26, 2021, Caldwell Bank is owed $450,088.39. But-for the breach by Homeland of the merger agreement and Certificate, Caldwell Bank would be fully secured because the value of the stock ($686,625.00) is greater than the amount owed to Caldwell Bank. As a result, Caldwell Bank has been damaged by

Homeland's breach in an amount equal to $450,088.39, plus interest, until paid, which is the lesser of the amount owed Caldwell Bank or the value of the stock.

**D.      Homeland is liable pursuant to La. R.S. §§ 10:8-405 and 10:8-210.**

La. R.S. § 10:8-405 governs the replacement of lost, destroyed, or wrongfully taken security certificates. This statute provides:

> (a) If an owner of a certificated security, whether in registered or bearer form, claims that the certificate has been lost, destroyed, or wrongfully taken, the issuer shall issue a new certificate if the owner:
> (1) so requests before the issuer has notice that the certificate has been acquired by a protected purchaser;
> (2) files with the issuer a sufficient indemnity bond; and
> (3) satisfies other reasonable requirements imposed by the issuer.
>
> (b) If, after the issue of a new security certificate, a protected purchaser of the original certificate presents it for registration of transfer, the issuer shall register the transfer *unless an overissue would result. In that case, the issuer's liability is governed by R.S. 10:8-210*. In addition to any rights on the indemnity bond, an issuer may recover the new certificate from a person to whom it was issued or any person taking under that person, except a protected purchaser.

La. R.S. § 10:8-405 (emphasis added).

Pursuant to La. R.S. § 10:8-405, when both the new security certificate and the original security certificate were pledged to "protected purchasers," the issuer is under an obligation to honor and register both certificates "unless an overissue would result." Furthermore, per La. R.S. § 10:8-405(b), if an overissue would result, the issuer's liability is governed by La. R.S. § 10:8-210. La. R.S. § 10:8-210(d) then importantly provides "if a security is not reasonably available for repurchase, a person entitled to issue or validation may recover from the issuer the price the person or the last purchaser for value paid with interest from the person's demand."

Therefore, pursuant to La. R.S. § 10:8-405, there are two main elements Caldwell Bank is required to meet for Homeland, as the issuer of the stock, to be liable for an amount to be determined by La. R.S. § 10:8-210. First, Caldwell Bank must show that it is a "protected purchaser" of the original certificate. La. R.S. § 10:8-303 defines what constitutes a "protected purchaser" under Louisiana law. Second, Caldwell Bank must show that the reissuance of the original stock certificate pledged to it resulted in an overissue of the stock. Then, and only then, may Caldwell Bank look to La. R.S. § 10:8-210 to calculate damages that Homeland must pay.

> La. R.S. § 10:8-303 defines "protected purchaser" as follows:
>
> (a) "Protected purchaser" means a purchaser of a certificated or uncertificated security, or of an interest therein, who:
> (1) gives value;
> (2) does not have notice of any adverse claim to the security; and
> (3) obtains control of the certificated or uncertificated security.
>
> (b) In addition to acquiring the rights of a purchaser, a protected purchaser also acquires its interest in the security free of any adverse claim.

La. R.S. § 10:8-303.

Subsection (a) of La. R.S. § 10:8-303 lists the requirements that a purchaser must meet to qualify as a "protected purchaser." Subsection (b) provides that a protected purchaser takes its interest free from adverse claims. "Purchaser" is defined broadly in La. R.S. § 10:1-201. A secured party can qualify as a protected purchaser.

To qualify as a protected purchaser, a purchaser must give value, take

without notice of any adverse claim, and obtain control. Value is used in the broad sense defined in La. R.S. § 10:1-201(44). Adverse claim is defined in La. R.S. § 10:8-102(a)(1). La. R.S. § 10:8-105 specifies whether a purchaser has notice of an adverse claim. Control is defined in La. R.S. § 10:8-106.

Both CKB and Caldwell Bank meet the requirements of La. R.S. § 10:8-303. First, they both gave value for their secured interest in Homeland stock. CKB gave value to Ward for its security interest in the stock in the form of continued forbearance to collect over $3 million on Debtor's indebtedness that had matured, for which Ward and his wife were solidarily liable as guarantors. Caldwell Bank gave value to Ward in exchange for its security interest in the stock in the form of extending credit to the Ward-owned entities of Radioactive Images, LLC and Ward Chevy.

Second, neither CKB nor Caldwell bank had "notice of any adverse claim to the security" when they acquired their security interest in the stock. CKB filed a declaration that it had no notice of Caldwell Bank's competing claim in the stock when it acquired a security interest in the stock represented by Certificate 495. Caldwell Bank likewise filed a declaration attesting to the fact that because CKB did not acquire its security interest in the stock until after Caldwell Bank acquired its interest, Caldwell Bank had no notice of CKB's competing claim. These facts have not been controverted and the court finds the declarations to be competent summary judgment evidence to this point.

Third, both CKB and Caldwell Bank obtained control of the stock certificates.

Ward delivered physical possession of Certificate 459 to CKB on April 25, 2019, and CKB has maintained consistent custody, control and physical possession of Certificate 495 since that time. Ward delivered physical possession of Certificate 253 to Caldwell Bank on August 23, 2006, and Caldwell Bank has maintained consistent custody, control and physical possession of Certificate 253 since that time. CKB's interest in the stock represented by Certificate 495 and Caldwell Bank's interest in the stock represented by Certificate 253 are in the same shares of Homeland stock. Thus, this court finds that both CKB and Caldwell Bank are "protected purchasers" pursuant to La. R.S. § 10:8-303.

Additionally, when the original and newly issued stock certificates were both pledged to "protected purchasers," as they were in this case, the issuer is required to honor both certificates "unless an overissue would result". La. R.S. § 10:8-405(b). In this case, an overissue resulted from the double-pledge of the same stock. Homeland's issuance of Certificate 495 (to replace Certificate 253, which Homeland cancelled) resulted in the "overissue" of two pledges of the same stock.

The requirements to establish Homeland's liability as the erroneous over-issuer of duplicate stock to "protected purchasers" pursuant to La. R.S. § 10:8-405 have been met. The court now turns to La. R.S. § 10:8-210 to determine the damages Homeland owes.

When an issuer of stock is required to honor both the original certificate of stock and the new certificate of stock because they have both been pledged to "protected purchasers" but the issuer cannot as it would result in an overissue, the

"protected purchaser of the original certificate" has "an action for damages." La. R.S. § 10:8-405, cmt. 2.

The "protected purchaser" of the original certificate is Caldwell Bank. As the original "protected purchaser," Caldwell Bank suffered damages as a result of Homeland's reissuance of Certificate 495 to Ward, which resulted in CKB acquiring a first ranking security interest in the stock. As such, the "person entitled to issue or validation [Caldwell Bank] may recover from the issuer [Homeland] the price the person or last purchaser for value paid for it with interest from the date of the person's demand." *See*, La. R.S. § 10:8-210(d); s*ee also* La. R.S. § 10:8-405, cmt. 3 ("[t]he right to recover damages from an issuer who has permitted an overissue to occur is well settled.").

The measure of damages to determine how much Caldwell Bank paid for its interest in Homeland stock is established by *Whitney*. Using the *Whitney* standard, the appropriate measure of damages is the lesser of the amount owed by Ward Chevy and Ward to Caldwell Bank or the value of the stock. The value of the Homeland stock has been established to be $686.625.00. The amount Caldwell Bank is owed via the consent judgment against Ward Chevy and Ward is $450,088.39. Thus, because the value due is lesser than the value of the stock, Homeland is liable to Caldwell Bank in the amount of $450,088.39, plus interest from and after April 27, 2021.

E.     **<u>Court does not reach any other issue in the motion</u>.**

The motion for summary judgment presented other issues, including a claim

against Homeland for negligence. Because this court has determined that Homeland is liable for reasons previously stated, the court pretermits consideration of any other issues raised in the motion.

## Conclusion

Based on the uncontroverted evidence and viewing in a light most favorable to the non-moving party, "no reasonable factfinder" could find for the party opposing summary judgment. *Maddox v. Townsend & Sons, Inc.*, 639 F.3d 214, 218 (5th Cir. 2011). The moving party is entitled to judgment as a matter of law. Summary judgment is proper.

Accordingly, for reasons given, this court **GRANTS** the motion for summary judgment. A separate order in accordance with this ruling will follow.

###